Good morning, your honors. My name is Anthony Angelo, attorney with the Legal Aid Society of San Diego, appearing on behalf of the appellant, Joe Martinez. This matter is an appeal from the Commissioner of Social Security's denial of Mr. Martinez's claims for Social Security Disability Insurance and SSI benefits. As this is an appeal for an administrative ruling, the matter is taken to NOVO, and such our appeal stems from the decision of the ALJ in this matter. The ALJ made a number of errors in analyzing and applying the appropriate legal standards to the testimony, medical records, and expert opinion evidence presented to him in this case. As a result of those failings to follow and apply the proper analysis, we have a decision that's not justified by substantial evidence, or not supported by substantial evidence. This hearing took place in July of 2010. Mr. Martinez was the only witness to testify. He gave testimony regarding the pain and limitations he suffers from his diabetes condition, as well as his obesity, the foot and ankle ailments, testifying basically to his limitations, the ability to walk, lift, bend, crouch, to perform a number of work-type activities. The ALJ decision is basically completely silent on Mr. Martinez's testimony. There is no analysis of any answer to any question they gave that the ALJ asked. There's no discussion of any part of his testimony. When a claimant provides testimony regarding subjective pain limitations evidence, so long as those complaints are reasonably tied to a medically determinable impairment, the ALJ is required to conduct a credibility analysis, and through that credibility analysis generally show clear and convincing reasons for rejecting that claimant testimony. There is no credibility analysis here. The ALJ failed to perform what he was supposed to do with regards to Mr. Martinez's testimony, and that was error. Under the credit as true doctrine, when a claimant testimony is rejected, the reviewing court should view that testimony as true, particularly when it comes to the issue of remanding or reversing a case. I failed to mention I wanted to reserve five minutes of my time for rebuttal. Go ahead. Thank you. In addition to ignoring the claimant's testimony, the ALJ also ignored medical— I thought you said you were reserving five minutes for rebuttal. Were you? Oh, am I at ten minutes already? No, no, no. I thought you were— We thought you were finished. I thought you were finished. No, I meant to say that in my windup, and I forgot your— Actually, we have a number of questions for the government. You might actually want to reserve the rest of your time to see what we— Okay. I will take a seat. Thank you. Okay. Good morning, Your Honors. Good morning. Zia Modi on behalf of Carole W. Colvin, Acting Commissioner of Social Security. Substantial evidence supported the ALJ's determination in this case that the claimant was not disabled. What was the substantial evidence as to the non-exertional limitations, and how did that—how were the grids applied to that non-exertional limitation? Well, in this case, the grids were not applicable because the non-exertional— But they were not applicable. I'm sorry. I'm sorry. The grids— No, you're quite right. They were not applicable. I greatly apologize. It was a Freudian slip, but— There was no way— We never penalize counsel that blurt out the truth. No, no, that was—that was my evil twin there. I will— Tell me why the grids are applicable if the grids don't consider non-exertional limitations, and the grids were applied without a vocal—without a rehabilitation expert. Well, the grids were applicable in this case, and so I apologize for that misstatement. Grids were applicable in this case because the non-exertional limitations that were, for example, contained in the opinion of the state agency reviewing physician, the limitations on balancing, on climbing ladders, ramps, and scaffolds, they don't erode the sedentary occupational base.  There were two non-exertional limitations, which even Dr. Brodsky agreed to. Number one, that Martinez lacked balance, right? Number two, that Martinez, because of his diabetic condition, had to take frequent restroom breaks, breaks when appropriate, right? Those were two non-exertional limitations. Now, if those go to the ability to do sedentary work and the grids don't take those into consideration, then the ALJ's use of the grids seems to me to be in error. Well, Dr. Brodsky didn't find any limitations with regard to the claimant's ability to use the necessary— his necessity to use the restroom. No, no, no. Take a look at Dr. Brodsky's report. He found that he could not stoop and he could not—he had bad balance. He checked off the box never, never. So now, you can't very well say that Brodsky didn't find those two non-exertional limitations. We agree on common ground that non-exertional limitations are not mentioned in the grid, right? Are we? Non-exertional limitations don't preclude the application of the grids. And in this case— No, no, no, no. Put it the other way around. Okay. The grids do not take into consideration non-exertional limitations when they come to the issue as to whether the person can do the sedentary work. True? Okay. Yes. All right. So therefore, if there are non-exertional limitations, right, you have to call a vocational rehabilitation expert to say why these non-exertional limitations do not limit this person's ability to do sedentary work available in the national economy. That is not the case here. Under HOOPAI— My recitation, pardon me for being so long-winded, of the law is in error, so therefore, you're going to tell me how it's in error. Good. Yes. Now, what is the case? Under HOOPAI v. ASTRU, when the non-exertional limitations do not significantly erode the claimant's ability to perform a full range of sedentary work, the non-exertional limitations then do not preclude the application of the grids. And in this case, the non-exertional limitations that Dr. Brodsky found do not preclude the application of the grids. Is that case cited in your brief? It is cited in our brief. Tell me where. It is cited at—it is in the final section. It is cited at—it is cited—it starts—the argument begins at page 41 in our answering brief and continues to page 45. And in our brief, we cite—we do cite to HOOPAI for the point that non-exertional limitations that are not sufficiently severe as to significantly limit the range of work permitted by the claimant's exertional limitations, those non-exertional limitations do not preclude the application of the grids. And that is why the grids were properly applied in this case. As you mentioned, Dr. Brodsky, for example, found the claimant limited in his ability to balance. But under the agency's Social Security rulings, specifically Social Security ruling 96-9P, a prohibition on balancing does not significantly erode a claimant's occupational base because balancing, as defined in the agency's rulings, contemplate an inability to maintain your equilibrium on a narrow or slippery or—I think the word was erratic—erratically moving surface, which in sedentary work, you're not exposed to those kind of environments. And so that is why—and similarly, crouching, that is not something that significantly erodes— Let me ask you a question just along those lines. The gentleman here was examined by Dr. Novak, right? Yes. He was an examining physician. And that doctor found that Martinez could stand or walk for less than two hours, could sit for less than six hours, could carry or lift less than 10 pounds occasionally. All right? So he's the examining physician. Then we get Dr. Brodsky. Now, Dr. Brodsky was not an examining physician, right? And now, did the ALJ give specific and legitimate reasons why he rejected Dr. Novak's assessment at being the examining physician, and instead he simply relied on Brodsky, a non-examining physician? He's not supposed to do it that way. So why do we—why do we worry about Dr. Brodsky? Well— I mean, did he give those reasons? Those reasons are present, and I should note first that both— Did he give them? Well, both the circuit precedent and the— No, did he give them? I'm just asking you a question. Yes. The ALJ provided those reasons for why Dr. Brodsky's opinion controverted the opinion of Dr. Novak. Dr. Brodsky specifically noted that Dr. Novak's opinion, for example, was not consistent with her own examination findings. Dr. Novak assessed limitations on Klayman's ability to lift, but Klayman, during the examination, had full strength and normal range of motion in his upper extremities. Let me ask you this. When this gentleman was at Tri-Cities, and the conclusion there was that diabetes was poorly controlled at baseline, and they were treating him, right? And did the ALJ mention that Martinez's diabetes is poorly controlled at baseline when he rejected what the Tri-City diagnosis was? Well, the ALJ's decision notes that Klayman's diabetes was poorly controlled, but the ALJ's decision notes that Klayman's diabetes— Well, the ALJ says that his decision said that he was noncompliant with the medications. Now, that isn't in the Tri-Cities report, is it? It just said it's poorly controlled at baseline. Well, throughout the— So he misstated that. The ALJ— The Tri-Cities record might have stated that, but elsewhere in the record, it notes that Klayman's diabetes— Well, you're supposed to go through each one of these. He didn't do that. The ALJ didn't specify the particular Tri-Cities report, but the ALJ's decision notes—cites the longitudinal medical record to note that, first, Klayman was noncompliant with prescribed treatment, and that when Klayman was compliant with prescribed treatment, his condition improved. For example, he presented for treatment in September 2008 with complaints related to his diabetes condition. What are you looking at now? Excuse me? What are you looking at now? This is—well, in the excerpts of the record, this is page 434, and there's a visit where Klayman visits the emergency room with complaints related to his diabetes, and upon discharge, it's first noted that he's asymptomatic and that his symptoms resolved with treatment and that his blood sugar levels were well controlled. You talk too fast. Let me ask you another question. He was at Scripps Hospital, right? He had a diabetic ulcer and neuropathy. His blood sugar was at suboptimal level after a week of inpatient treatment. And the ALJ, in his opinion, did not say anything about Martinez's blood sugars, that they were suboptimal, even after a week of inpatient treatment. Didn't even address that. It just didn't touch it, huh? And then when Dr. Shohi found that Mr. Martinez had decreased muscle strength in his lower legs, weakness in his plantar musculature, plantar atrophy, prominent bone mass on foot, vertigo, fallen arches. He was a treating physician. And then Scope Orthotics said that he, this is another treating physician, that he only had limited ability to walk without an assistive device. He could only walk a quarter of a mile with an assistive device. And the ALJ didn't discuss Dr. Shohi's or Scope's diagnosis at all, even though they were treating doctors or medical providers. They just brushed it aside. And Martinez testified that he is in pain all the time. Takes him 15 minutes to walk a block. He uses a cane. He's homeless. His feet get swollen. He must elevate them for three hours a day. The ALJ didn't make any credibility finding before dismissing Martinez's testimony. And the ALJ failed to consult a vocational expert. There was no vocational expert here, right? No. Yeah, there wasn't any. Before finding substantial jobs in the national economy. So he didn't do a very thorough job, did he? Well, I think the ALJ's decision going in order there, starting with the treating physician's evidence, the ALJ specifically notes that no treating physician notably found Klayman unable to work. Dr. Shohi, for example, the treating podiatrist, Dr. Shohi didn't observe any marked limitations to Klayman's ability to walk. Nor did Dr. Shohi impose any limitations on Klayman's ability to walk. Dr. Shohi instead recommended diabetic foot care, counseling, and a shoe recommendation. So that's a treatment recommendation that's not consistent with the finding of disability. May I interrupt you for a second? I took note when you were telling me about what the ALJ found based on Dr. Brodsky's and Dr. Novak's, well, Dr. Novak's findings. And you said that the petitioner had full range of motion and full strength, right?  Well, I've been looking at Dr. Novak's record here, and I haven't found any finding that he had full strength. As a matter of fact, he did test his right grip strength and his left grip strength, and his right hand, which was dominant, was less than his left hand. Can you tell me where in Dr. Novak's report there's any finding as to full strength, which is what you said? Sure. Because that would be very important as to whether he could do sedentary work. Okay. On page 393 of the certified, of the rather supplemental excerpts of record that Polly submitted, starting with the upper extremities, first of all notes that the range of motion was grossly normal bilaterally in the upper extremities, and going down the page to neurologic findings, it says motor, good tone bilaterally, good active motion, strength is 5-5 in all extremities. I see. Well, thank you. Yes. Thank you very much. And then returning to, I was in a discussion about the treating physician's recommendations. But the ALJ didn't consult a vocational expert before finding substantial jobs in the national economy. As I mentioned earlier, a vocational expert was not necessary because the grids were applicable in this case. Non-exertional limitations that even Dr. Brodsky found did not preclude claimant performing a full range of sedentary work. The postural limitations are not, do not preclude a claimant from performing sedentary work. Limitations on balancing, as I discussed earlier, under the agency's own rulings, specifically 96-9P, those restrictions do not preclude the application of the grids in this case. Hence, the ALJ properly found, using the grids, that claimant could perform work in significant numbers in national economy. Well, that's what Dr. Brodsky says, right? Yeah. His opinion was based on Dr. Novak's examination. He also had the benefit of reviewing other records. And Dr. Novak's views were to the contrary. Well, Dr. Brodsky did have the benefit of reviewing other evidence of records, specifically Dr. Yeah. Dr. Novak did not review any records. He never examined this person. He never examined Martinez, did he? No. Dr. Brodsky did not examine the claimant. He did examine. Just look at the paper. Yeah. Can I ask you the name of the doctor other than Novak upon whom Dr. Brodsky relied? Well, Dr. Brodsky, in his examination, in his report, he notes that he reviewed records from claimant's period of incarceration. And so it's the totality of his medical records when he was in jail. And those records, for example, claimant notes on his intake to jail that he denied any limitations in mobility and denied any limitations in his vision, which relates to his diabetes. And as well, an X-ray taken near the end of claimant's period of incarceration found that a foot fracture in his right foot had healed. And so that was evidence that Dr. Brodsky relied upon in addition to Dr. Novak's examination. When was the petitioner released from jail? I do not know the specific date in which petitioner was released from jail. I mean, these jail intake records, are they dated? They begin, I think his intake was December 2007. The records, I believe, end in January 2008. That was about eight months before Dr. Novak's September 2008 examination. Yes. If we determine that there was error here, can you address whether we should invoke the credit as true doctrine or simply remand for a redetermination? Sure. Well, under Garrison, credit as true for payment would be inappropriate because serious doubt exists as to the claimant's actual existence of disability in this case. And the evidence I cited creates that serious doubt, starting with objective medical findings throughout the relevant adjudicatory period that show the claimant had normal neurological function. Wait a minute. Answer Judge Tallman's question. If you lose. Sure. Right? Yes. What remedy? Well, remand would be appropriate because of the discussion that was about it. Remand for what? Remand for further administrative proceedings. For those four years only? Because now he's got disability. Yes. It would be for that period. Because obviously since he attained the age of 50, his status is different. But it would be for the period, I would assume, covered by the AHA's decision. Why should we do that? Because he's already getting his disability. How long after he was turned down? Well, he became eligible for disability benefits based on the RFC that the ALJ found. The ALJ, as stated, found that he was able to do a full range of sedentary work. Under the GRID rules, once a claimant attains the age of 50 and has a sedentary RFC, they're disabled under the GRIDs. He had not attained the age of 50 during the adjudicatory period that is at issue here. Once he got his benefits, he reapplied after he had turned 50. And the grant was based on his attainment of the age of 50. It's not related to the medical evidence here. So he actually was able to use the ALJ's determination that is now before us, coupled with the fact that he'd now turned 50 in order to qualify for benefits. Indeed. Indeed. The RFC the ALJ found benefited his subsequent application. Okay. So you think we ought to send it back and have him go through the whole thing, huh? When we had an ALJ that didn't do his job. I would initially submit first that the ALJ's decision was supported by substantial evidence based on the objective medical evidence and the analysis of claims credibility. But if you were to find otherwise, then remand for further administrative proceedings would be appropriate in this case. Yes. Thank you. Thank you. Okay. Well, what do you think would be the appropriate remand? I don't think remand is appropriate. I think reversal is appropriate. Under credit is true. Speak a little louder. I'm sorry. Under credit is true if the ALJ has improperly rejected claimant testimony or expert opinion, the court should credit that as true. In the decision, the ALJ says that Dr. Novak's opinion would typically result in a finding of disability. If this court finds that Dr. Novak's opinion was insufficiently or improperly rejected, it should credit as true, and thereby the ALJ's own reasoning, this case should be reversed. He should have been found disabled, not able to perform sedentary work. Counsel? Yes. I'm bothered by your position that the ALJ didn't say specific legitimate grounds for finding that the man was not disabled. He relied on findings in Dr. Novak's report. The ALJ said Dr. Brodsky relied on Novak, right? Well, yeah, the ALJ references Brodsky to reject Novak without, well, without much particularity. Well, let me ask you the question I had in mind. Okay. We often have incorporation by reference. That's a doctrine we all lawyers use, right? Is it your position that the ALJ should say anything more than Brodsky was justified in relying on Novak's findings in disagreeing with him? Does he have to say Novak's finding as to this, as to that, as to the other? Does he have to repeat all of Novak's findings, or is a reference to Novak's findings sufficient under the law? So I think it's somewhere between not an exhaustive recounting of Dr. Brodsky's findings, but there's got to be something more than what he did here, enough to show specific and legitimate reasons. Well, the specific, if he says all the specific and legitimate reasons are in Novak's report, right? Okay. Does he have to say which says and then repeat Novak's report? I think specificity would require that. You can't just reference an 11-page report and say based on that. I mean, there should be something pulled out of it so that the claimant knows exactly what he's relying on. Now, do you have a case that says the ALJ cannot incorporate by reference the findings of an examining physician, but must repeat those salient findings and let us know what he thought was important and what was not important? Well, I think this case is a bit different, Your Honor. The ALJ is rejecting the examining physician in favor of using the non-examining. The ALJ is not rejecting the examining physician's findings as evaluated by Dr. Brodsky. Here's what we've got. We've got your Dr. Novak, the one that you like, saying that the petitioner has full range of body motions except in his ankle, that he has five-slash-five body strength, that he can walk unassisted, that is, without a cane, but slowly, right? And that he has full push ability with his upper extremities, but not with his legs. Now, based on just those three or four things that I've mentioned, why can't this ALJ find that under the grids, this petitioner can be a parking lot attendant? Well, that, those findings, and I believe you're reading from Dr. Brodsky's. No, no, I'm reading. Those are all my findings. I've taken notes on Dr. Novak. Well, there are additional findings in Dr. Novak's report that paint a broader picture, a better picture. But those aren't the findings that Brodsky relied upon. Can Brodsky rely on some findings of Novak which show that this man is able to do sedentary work and not rely on others? Or must he take Novak 100 percent? Being a non-examining physician, he has, the law says that his opinion sits in a lower rung than. I'm not talking about his opinion. Okay. I'm talking about findings. Well, can I talk about Dr. Novak's findings? Yes. That we're not discussing. Those are the ones I just, full range of motion, full strength, able to walk without a cane, and has push and pull abilities in his upper extremities. He can't be a parking attendant? That's, Your Honor, that's a mischaracterization of Dr. Novak's findings. She said he could walk across the examination room slowly on the lateral edges of his feet, that he could not stand on heels or toes, that he could not perform tandem gait. Tandem gait is taking normal steps. That summary that we're talking about now, and I do believe that's the one that Dr. Brodsky used, is just not an accurate representation of Dr. Novak's observations. She also tested his reflexes, his pedal pulses, and those were all deficient. So there's, Dr. Novak saw this claim. She saw his body habitus. She explored his edema. She looked at his x-ray. She observed him move about the room, and it was her determination that he could not walk enough or have the strength enough to perform sedentary work. Dr. Brodsky's review of that is really plain. There's a big difference between examining a patient, coming up with a report, coming to a conclusion, and then having a third party, another doctor, who's never seen the patient, just looks at the paper and comes to exactly opposite conclusions. And it's the examining physician who is to be credited, not the non-examining. I mean, you know, there's situations where one judge can put down all the facts, come to a certain conclusion. Another judge can come along and just copy everything that was done, come to another conclusion. Yes, and I think that's what happened here with Dr. Brodsky, Your Honor. He did his report, I think, within a week or two of Dr. Novak's. And so as a reviewing physician, his review of the medical records was far from complete. There's over 100 pages that came into evidence after the date of his review, including the podiatrist specialist records, including the orthotics records, and continuing other records of treatment. So Dr. Brodsky's review is just inherently flawed. The regulations- Let me ask you a question about that. Can I direct your attention to ER 394, which is Dr. Novak's report on her functional assessment of Mr. Martinez? And then I'd like you to compare that with ER 406, which is Dr. Brodsky's report, in which he discusses Dr. Novak's findings from the functional assessment and notes that there are no inconsistencies within or between the reports and allegations. And just so you understand where I'm coming from, I don't see anything in the three paragraphs on Dr. Novak's functional assessment at page 394 that undermines Dr. Novak's conclusion that Mr. Martinez is prepared for a sedentary, whatever, residual functional capacity performance level. Where are you looking at? Right here. I think you meant Dr. Brodsky. Brodsky, yeah. Here's the functional assessment. You understand my question? So we're looking at, and I apologize, you and I have our excerpts of record, and it has different pages. Okay, it's page 6 of Dr. Novak's typewritten report, and it's under the subheading of functional assessment. And it's three paragraphs there that summarizes her examination findings. Okay. And what in her findings supports, what in her observations supports- What's inconsistent in her functional assessment with Dr. Brodsky's conclusion at page 406 of his report that Mr. Martinez is still capable of sedentary, residual functional capacity performance? And if you'll note on 406, he references Dr. Novak's report and summarizes at the top of page 406 in about three sentences the conclusions that she lays out under the functional assessment at 394. Well, I would speak to what's inconsistent about Dr. Brodsky's, I guess under the paragraph there, questions and recommendations, where he finds that I think there's this number of errors in here. Counsel, you're not answering my question. I'm giving you a very specific question. I'm asking you to look at the three paragraphs in Dr. Novak's functional assessment report, which is then incorporated or referenced in Dr. Brodsky's report at page 406, and asking you to tell me what's inconsistent between the findings from Dr. Novak's report, which Dr. Brodsky cites at page 406, and then concludes results in a sedentary, residual functional capacity determination. Thank you. Dr. Novak assesses that he needs an assistive device for ambulation, which she acknowledges in paragraph 2 on page 394. So that's consistent, is it not? Okay. The answer to my question is there are no inconsistencies, that Dr. Brodsky is relying on Dr. Novak's functional assessment in concluding that he's at least capable of doing a sedentary, residual functional capacity. Yeah, I agree he hasn't reviewed anything else by his notes. What was Brodsky's, what was Dr. Novak's medical conclusion? Was that Mr. Martinez was unable to perform even sedentary work so that he had limitations in his ability to ambulate, as well as lift. So sedentary work is generally the ability to walk for two hours of an hour a day and perform lifting, I think, about 10 pounds frequently and occasionally. And there's also non-exertional limitations. So then Dr. Brodsky's looking at the same written findings becomes to a different conclusion. That's correct. Yeah, but when the ALJ is evaluating the examining physician over the reporting physician, what do the rules require? Well, the rules state that ordinarily the examining physician prevails unless the ALJ can show specific and legitimate reasons for rejecting that opinion. And his reasons are basically just the opinion of Dr. Brodsky, which I believe, as we cite under Fritz, is not legally recognized as a sufficient reason. Did anything Did that occur here? Excuse me? Repeat what you said. From my reading of the ALJ decision, his only stated reasons for rejecting Dr. Novak's opinion are the opinions of Dr. Brodsky. The conclusion? The conclusion. Yeah, okay. And is he permitted to do that? I don't believe so, and we've briefed that out, Your Honor. Well, I thought the rule was that you give priority. Oh, I'm sorry. He can do it, but he has to show specific and legitimate reasons in order to. So he can reject the examining physician's opinion. All right, so has he done that? Our argument is he has not shown specific and legitimate reasons. Our argument, Your Honor, is that he has not shown specific and legitimate reasons to reject Dr. Novak's opinion. Got your position. Thank you. I do have a couple other things I wanted to. Your five minutes. That's all right. You've got anything else you want to say? I just wanted to note that in discussion with counsel, he was referencing in jail they didn't cite any problems with his mobility. He was actually on crutches and wearing a cast the entire time he was incarcerated, and I thought that was important to point out. Say that again because you're mumbling. I'm sorry. The entire time Mr. Martinez was incarcerated, he was. Speak slower. Your generation talks too fast. I'm sorry. The entire time Mr. Martinez was incarcerated. Slow down a little more. He was in prison. He was in prison. He was using crutches and a cast for ambulation, and I wanted to clarify that. Crutches and a cast for ambulation. That's correct. And that he used. I'll just leave it at that. Thank you. What did you just say? He said he's leaving it at that. Is that what you said? Yes, sir. Thank you. Thank you very much. Thank you.
judges: Pregerson, Tallman, Bea